# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE
### February 11, 2026 Session

## STATE OF TENNESSEE v. KEITH DOUGLAS GARRETT

**Appeal from the Criminal Court for Macon County**
**No. 2022-CR-1      Brody N. Kane, Judge**

_____

### No. M2024-01925-CCA-R3-CD

_____

A Macon County jury convicted the Defendant, Keith Douglas Garrett, of one count of unlawful photography and one count of observation without consent. The trial court sentenced the Defendant to serve eleven months and twenty-nine days and to register as a sexual offender. On appeal, the Defendant argues that the prosecution was void due to alleged defects in the arrest process and that the trial court erred in denying his motion to suppress statements he made to investigators under *Garrity v. New Jersey*, 385 U.S. 493 (1967). He also challenges the admission of digital evidence extracted from his cell phone and alleges that the State failed to disclose an additional forensic extraction report. In addition, he contends that the State engaged in an improper closing argument. Finally, he challenges the trial court's sentencing determinations, including the denial of judicial diversion and alternative sentencing and the requirement that he register as a sexual offender. Upon our review, we respectfully affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed**

TOM GREENHOLTZ, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JOHN W. CAMPBELL, SR., JJ., joined.

Peter J. Strianse, Nashville, Tennessee, for the appellant, Keith Douglas Garrett.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Jason Lawson, District Attorney General; and William A. Calla and Thomas H. Swink, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND

This case began when the Defendant's wife discovered nude images of her eighteen-year-old daughter, the Defendant's stepdaughter, on the Defendant's cell phone. At the time, the Defendant was employed as a trooper with the Tennessee Highway Patrol ("THP").

Federal authorities investigated the matter, with some involvement by THP personnel assigned to the Federal Bureau of Investigation ("FBI") task force. The investigation ultimately resulted in two recorded interviews with the Defendant, the seizure and forensic examination of his cell phone, and a jury trial that concluded with convictions for unlawful photography and observation without consent. Because the Defendant raises issues arising from the investigation, the suppression hearing, the proof at trial, and the sentencing hearing, we recount the relevant facts as they developed at each stage of the proceedings.

### A. DISCOVERY OF THE IMAGES

In April 2020, the Defendant lived in Macon County with his wife, J.M.,[1] and her three children, including the victim. One day, while the Defendant was outside mowing the lawn, J.M. accessed his cell phone using his passcode. After opening the phone's photo application, she observed a nude image of her daughter. J.M. then opened the phone's "favorites" folder and discovered recordings of her daughter in the shower.

J.M. contacted her brother, who worked for the FBI, for advice. An FBI agent later instructed her to document what she had discovered on the Defendant's phone. Using her own cell phone, J.M. recorded portions of the Defendant's phone screen to preserve the images and recordings she observed.

On June 18, 2020, federal law enforcement officers seized the Defendant's cell phone from his patrol vehicle. FBI investigators first conducted what they described as an "on-scene preview," during which they obtained the passcode needed to unlock the phone.

---

[1] Because identifying the victim's mother by name could tend to identify the victim, we refer to her by the initials "J.M."

Investigators later performed a more extensive forensic extraction using Cellebrite software.

## B.    THE JUNE 2020 INTERVIEWS

In June 2020, an FBI special agent and a detective with the Metropolitan Nashville Police Department ("MNPD") conducted two recorded interviews of the Defendant as part of the ongoing criminal investigation.  Before the interviews, the THP placed the Defendant on discretionary leave pending an internal investigation into the allegations.  Both interviews occurred on the same day at the THP headquarters and concerned only the criminal investigation.

During the first interview, after being advised of his *Miranda* rights and waiving them, the Defendant initially denied any wrongdoing.  After the interview concluded, the investigators learned that a search team had discovered holes drilled above a bathroom shower at the Defendant's residence.  They conducted a second interview, and the Defendant acknowledged that he had previously received and waived his *Miranda* rights.

During the second interview, the Defendant admitted that he knew holes existed in the ceiling above the shower and that he used those holes to observe and record the victim while she showered.  The interview ended after the Defendant invoked his right to counsel.

The following day, the THP conducted a separate administrative interview.  During that interview, the Defendant was advised of his protections under *Garrity v. New Jersey*.  The THP terminated the Defendant's employment three days later, on June 22, 2020.

## C.    TRIAL PROCEEDINGS

On February 7, 2022, a Macon County grand jury charged the Defendant with unlawful photography and observation without consent.  Before trial, the Defendant sought to suppress his statements to the FBI, arguing that the circumstances surrounding the interviews created a penalty situation that effectively compelled his statements within the meaning of *Garrity v. New Jersey*.  Following a hearing, the trial court denied the motion to suppress, and the case proceeded to a jury trial in October 2023.

At trial, the State introduced images and recordings recovered from the Defendant's cell phone.  The jury also heard testimony from J.M., law enforcement officers involved in

the investigation, and the Defendant. At the conclusion of the proof, the jury convicted the Defendant of both offenses.

Following a sentencing hearing, the trial court imposed an effective sentence of eleven months and twenty-nine days to be served in confinement. The court also ordered that the Defendant register as a sexual offender pursuant to the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification and Tracking Act of 2004. *See* Tenn. Code Ann. § 40-39-201 *et seq*.

The Defendant filed a timely motion for a new trial, which the trial court denied by a written order entered on December 16, 2024. The Defendant filed a timely notice of appeal fourteen days later. *See* Tenn. R. App. P. 4(a).

## ANALYSIS

The Defendant raises five groups of issues on appeal. He first argues that defects in the arrest process rendered the prosecution void from the outset. He next asserts that the trial court should have suppressed his statements to investigators because they were compelled in violation of *Garrity v. New Jersey*. Third, the Defendant challenges the admission of digital evidence extracted from his cell phone and alleges that the State failed to disclose an additional forensic extraction report. Fourth, he argues that the prosecutor's closing argument deprived him of a fair trial. Finally, he challenges the trial court's sentencing decisions, including the denial of judicial diversion and alternative sentencing and the requirement that he register as a sexual offender.

We address each of these issues in turn.

### A.   EFFECT OF ARREST WARRANT ON PROSECUTION

The Defendant first argues that the prosecution was void from its inception because, in his view, the arrest process was defective. He asserts that law enforcement could not arrest him for misdemeanor offenses committed outside an officer's presence and that the affidavit of complaint failed to establish probable cause. The State responds that any defect in the arrest warrant or affidavit of complaint did not invalidate the later indictment returned by the grand jury. We agree with the State.

As background for this issue, THP Trooper Al Seitner filed an affidavit of complaint in the Macon County General Sessions Court in March 2021, alleging that the Defendant had committed the offenses of unlawful photography and observation without consent. The court issued an arrest warrant the following day, and the Defendant was arrested. In February 2022, a Macon County grand jury returned a two-count indictment charging the Defendant with unlawful photography and observation without consent.

Assuming, without deciding, that there were defects in the arrest process, those alleged defects would not invalidate the subsequent indictment in this case. *State v. Campbell*, 641 S.W.2d 890, 893 (Tenn. 1982) (holding that the State may choose to obtain an indictment to cure any defects in the charging procedure, including a defective warrant). Indeed, our supreme court has long held that the finding of an indictment forecloses "all questions as to the sufficiency of the warrant." *Jones v. State*, 332 S.W.2d 662, 667 (Tenn. 1960). Stated another way, "[t]he proceedings by the Grand Jury in finding an indictment or presentment against a person are not affected by the mode or manner of his arrest." *Shaw v. State*, No. M2018-00686-CCA-R3-HC, 2019 WL 410706, at *1 (Tenn. Crim. App. Jan. 31, 2019) (citing *Nelson v. State*, 470 S.W.2d 32, 33-34 (Tenn. Crim. App. 1971)), *no perm. app. filed*.

Here, a Macon County grand jury returned a true bill charging the Defendant with unlawful photography and observation without consent in February 2022. Once that indictment was returned, the prosecution proceeded on the indictment itself. Any alleged defect in the earlier arrest process did not render the prosecution void.

To the extent the Defendant also challenges the search warrant or the sufficiency of the affidavit supporting it, that issue is not properly before us. The Defendant's argument focuses on the arrest warrant and affidavit of complaint. His brief adds only a conclusory assertion that the affidavit supporting the search warrant for his residence "suffered from the same deficiency," with a footnote stating that the affidavit did not include a statement from the alleged victim. He does not develop a separate argument explaining why the search warrant or its supporting affidavit was defective, nor does he explain how any such defect would render the prosecution void or otherwise entitle him to relief.

Simply raising an issue is not sufficient to preserve it for appellate review. *See State v. Hamilton*, No. W2023-01127-CCA-R3-CD, 2024 WL 4130757, at *4 (Tenn. Crim. App. Sept. 10, 2024), *perm. app. denied* (Tenn. Feb. 20, 2025). Instead, a party must also present "argument in support of this issue in his brief" and cite to "any authorities [and] appropriate references in the record." *State v. Molthan*, No. M2021-01108-CCA-R3-CD, 2022 WL

17245128, at \*2 (Tenn. Crim. App. Nov. 28, 2022), *no perm. app. filed*.  By failing to do so here, we conclude that the Defendant has waived appellate review of this claim.  As such, the Defendant is not entitled to relief on this issue.

## B.    THE *GARRITY* CLAIM

The Defendant next contends that the trial court erred in denying his motion to suppress.  The motion concerned statements he made to FBI Special Agent Brett Shields and MNPD Detective Keith Sutherland during two interviews on June 18, 2020.  The Defendant asserts that the circumstances surrounding those interviews created a penalty situation that effectively compelled his statements within the meaning of *Garrity v. New Jersey*.

The State responds that no penalty situation arose because the THP did not conduct the interviews and did not expressly or implicitly condition the Defendant's employment on his cooperation with the FBI.  The State further notes that the THP maintained a written policy protecting a trooper's right to invoke the Fifth Amendment during an outside criminal investigation without adverse employment consequences.  We agree with the State.

### 1.    Background

The facts relevant to the motion to suppress arise from events occurring on the morning of June 18, 2020, at the THP's Nashville District Headquarters.  Sixteen days earlier, the FBI notified the THP that the Defendant was the subject of a federal criminal investigation.  Although the THP's established practice upon receiving such notice is to place the subject trooper on discretionary leave, the THP took no formal employment action during the intervening period.

On the morning of June 18, 2020, a supervisor directed the Defendant to report to the THP Nashville District Headquarters without providing a reason.  Upon his arrival at headquarters, the Defendant was escorted to a conference room.  There, THP Captain Chris Ray and Major Roy Brown served him with a Discretionary Leave Notice and collected his service firearm and security credentials.  Captain Ray informed the Defendant that another agency had initiated an investigation and that the THP was placing him on discretionary leave pending an internal investigation.  The captain could not recall whether he used the word "criminal" during that exchange.

Soon after the THP placed the Defendant on discretionary leave, he was escorted to a nearby conference room to meet Agent Shields and Detective Keith Sutherland. At the outset of the interview, the interviewers identified themselves, advised the Defendant of his *Miranda* rights, and informed him that they were investigating a criminal matter. The record does not show that any *Garrity* advisement was administered.

Following the first interview, Special Agent Shields received information that investigators executing the residential search warrant had discovered a hole drilled above the shower. He returned to headquarters and conducted a second interview with the Defendant. The second interview lasted about twenty minutes and concluded when the Defendant invoked his right to counsel. The record does not show that any *Garrity* advisement was administered before or during the second interview.

The following day, June 19, 2020, the THP conducted a separate administrative interview. Before that interview, the THP administered the Admonition of Rights form for the first time, advising the Defendant of his *Garrity* protections. The Defendant declined to participate in that administrative interview, and the THP terminated the Defendant's employment on June 22, 2020.

At the suppression hearing, Captain Ray testified about the events of the morning of June 18, 2020. He stated that the plan to place the Defendant on discretionary leave with pay and to have the FBI conduct its interview had been arranged in advance. Captain Ray further testified that the THP had the option of placing the Defendant on discretionary leave after the FBI interview but did not do so. He also said that discretionary leave is the first step in a disciplinary process that may, but does not necessarily, result in termination.

Captain Ray also testified at the suppression hearing regarding THP policies and practices governing employees in the Defendant's circumstances. He testified that an explicit THP policy prohibits any adverse employment consequences against a trooper who asserts Fifth Amendment rights in response to an outside criminal investigation. He also stated that this policy is communicated to all employees at the training academy and that each employee must acknowledge the policy in writing. Captain Ray further testified that the THP did not order the Defendant to cooperate with the FBI's investigation, and that the THP exercised no supervisory authority over the FBI task force other than providing assigned member troopers.

The Defendant testified at the suppression hearing that he had the impression that the THP and the FBI were working together that morning. He further testified that he felt

compelled to cooperate with the FBI or risk his employment. The Defendant also stated that, although he had a general understanding of *Garrity* protections, no one had advised him of those protections on June 18, 2020. On cross-examination, the Defendant acknowledged that no discussion of his employment occurred during either interview. He also admitted that, although he felt compelled to cooperate, he did not tell the truth during the interviews because it was a "risk [he] was willing to take."

Additionally, the Defendant testified at trial that he was served with a search warrant listing THP Trooper Al Seitner as the affiant. The Defendant stated that, upon seeing the trooper designation on the warrant, he concluded that the THP was directing the investigation and the FBI was providing assistance.

Special Agent Shields testified at the suppression hearing that Trooper Seitner was a member of the FBI Violent Crimes Task Force under his direction. The THP's involvement in the task force consisted solely of Trooper Seitner's membership.

The trial court denied the motion to suppress by written order entered September 25, 2023. In that order, the court made several factual findings. First, the court found that the THP placed the Defendant on discretionary leave while he was present at headquarters due to safety concerns. The court found that this action was not taken to pressure the Defendant to cooperate with the FBI.

Second, the court found that the FBI interviews were not part of an internal or administrative investigation. The court noted that no discussion of the Defendant's employment occurred during either interview. Finally, the court found that the FBI was not the Defendant's employer, exercised no supervisory authority over him, and had no authority to sanction or terminate his employment.

The court also addressed the Defendant's conduct during the interviews. It found that the Defendant had no reservation about lying to Special Agent Shields, despite knowing that doing so constitutes a federal crime. The court characterized this conduct as evidence that the Defendant could exercise rational judgment during the interviews.

Finally, the court addressed the relationship between the THP and the FBI task force. The court found that the FBI was "wholly separate and apart" from the THP. It also found that the presence of one THP member on the ten-to-twelve-member FBI task force was "of no consequence to the interviews which were taken."

- 8 -

Based on these findings, the trial court denied the motion to suppress.

## 2.    Standard of Appellate Review

In reviewing a trial court's ruling on a motion to suppress evidence, "we uphold the trial court's findings of fact unless the evidence preponderates otherwise." *State v. Washington*, __ S.W.3d __, No. W2022-01201-SC-R11-CD, 2025 WL 2847585, at *3 (Tenn. Oct. 8, 2025) (citations and internal quotation marks omitted); *see also State v. Green*, 697 S.W.3d 634, 640 (Tenn. 2024); *State v. McKinney*, 669 S.W.3d 753, 764 (Tenn. 2023). The party prevailing in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing[,] as well as all reasonable and legitimate inferences that may be drawn from that evidence." *McKinney*, 669 S.W.3d at 764.

"[I]n evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *Id.* (citation and internal quotation marks omitted); *see also Washington*, __ S.W.3d __, 2025 WL 2847585, at *3. Nevertheless, we review the trial court's application of the law to the facts de novo with no presumption of correctness, despite the deference afforded to its factual findings. *See Green*, 697 S.W.3d at 640; *Washington*, __ S.W.3d __, 2025 WL 2847585, at *3.

## 3.    Governing Principles

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also* Tenn. Const. art. I, § 9. This protection extends to pretrial government conduct as well as to the trial itself. It prohibits the government from "penaliz[ing] assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized." *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977).

In certain situations posing a heightened risk of coercion, the Supreme Court has developed prophylactic rules to safeguard the Fifth Amendment privilege. The most familiar of these rules was established in *Miranda v. Arizona*, 384 U.S. 436 (1966). *Miranda* is not the only prophylactic rule protecting the Fifth Amendment privilege, and it is not the rule at issue here. A different rule was articulated the following year in *Garrity*

*v. New Jersey*, 385 U.S. 493 (1967). *See Chavez v. Martinez*, 538 U.S. 760, 768 n.2 (2003) (plurality opinion) (describing the *Garrity* rule as "a prophylactic rule we have constructed to protect the Fifth Amendment's right from invasion").

Whereas *Miranda* addresses the coercive pressures associated with physical custody, *Garrity* addresses a distinct form of compulsion: the government's use of threatened employment consequences to extract incriminating statements from public employees. In *Garrity*, the Supreme Court held that police officers could not be forced to choose between surrendering the privilege against self-incrimination and forfeiting their employment. *Garrity*, 385 U.S. at 497-98. As such, when the government creates this type of "penalty situation," any resulting statements are considered compelled and may not be used in a subsequent criminal prosecution. *Minnesota v. Murphy*, 465 U.S. 420, 435 (1984).

The Supreme Court elaborated on the *Garrity* doctrine in *Minnesota v. Murphy*. The Court explained that a penalty situation arises when the government, "either expressly or by implication," asserts that invoking the Fifth Amendment privilege will lead to a penalty. *Murphy*, 465 U.S. at 435. At the same time, *Murphy* made clear that the mere requirement that a person appear and answer questions does not, standing alone, create such a situation. *Id.* Without an accompanying express or implied threat of an adverse employment consequence, the Fifth Amendment privilege must be affirmatively invoked. The Court emphasized that there was no reasonable basis for the defendant to believe that his silence would be penalized. *Id.* at 437. *Murphy* thus recognizes that a penalty situation may arise when the government expressly or implicitly links the exercise of the Fifth Amendment privilege to an adverse employment consequence.

Neither the Supreme Court nor our Tennessee courts have developed a framework for determining when such an implied penalty exists. The lower federal courts, however, have developed analytical approaches for resolving such claims when there is no direct threat of an adverse employment consequence. One such approach is the subjective-objective framework articulated in *United States v. Friedrick*, 842 F.2d 382 (D.C. Cir. 1988), and later applied by the Sixth Circuit in *McKinley v. City of Mansfield*, 404 F.3d 418 (6th Cir. 2005). This framework reflects the principles described in *Murphy* and provides a structured method for evaluating implied-compulsion claims.

Under *Friedrick*, a defendant invoking *Garrity* protection must establish two elements. First, the defendant must show that he or she subjectively believed his statements were compelled by the threat of a substantial employment penalty. Second, the defendant

must show that this belief was objectively reasonable under the totality of the circumstances. *Friedrick*, 842 F.2d at 395. The subjective element focuses on the defendant's actual belief, whereas the objective element asks whether a reasonable person in the defendant's position would have formed that belief given the surrounding circumstances. *Id.*

The Sixth Circuit later applied and refined this framework in *McKinley v. City of Mansfield*. The court confirmed that a *Garrity* claim requires both a subjective belief of compulsion and an objectively reasonable basis for that belief. *McKinley*, 404 F.3d at 435-36. The court also clarified that the objective element does not require proof that termination was specifically threatened. Instead, the relevant question is whether the defendant reasonably believed that "substantial penalties were likely to result from his refusal to answer." *Id.* at 436 n.20.

We acknowledge that a minority of courts have required an explicit or automatic threat of termination as a threshold condition for *Garrity* protection. *See United States v. Indorato*, 628 F.2d 711, 715-16 (1st Cir. 1980). That approach is difficult to reconcile with Supreme Court precedent, as *Garrity* itself did not turn on the existence of an automatic termination rule. Instead, the Court emphasized the broader principle that forcing an employee to choose between self-incrimination and a significant penalty is constitutionally intolerable. *See Garrity*, 385 U.S. at 497. Likewise, *Murphy* recognized that a penalty situation may arise "either expressly or by implication." *Murphy*, 465 U.S. at 435. Several courts have therefore questioned whether the *Indorato* line of cases can be reconciled with Murphy, and we find those questions well taken. *See United States v. Trevino*, 215 F. App'x 319, 321 (5th Cir. 2007) ("Although *Indorato* did rely on the fact that *Garrity* dealt with an explicit threat of termination, neither *Indorato* [nor] *Garrity* rules out the possibility that implied threats could violate a defendant's *Garrity* rights."); *United States v. Goodpaster*, 65 F. Supp. 3d 1016, 1031 (D. Or. 2014).

We therefore decline to follow the *Indorato* approach. Instead, we adopt the framework articulated in *Friedrick* and *McKinley* for evaluating implied-compulsion claims under *Garrity*. Under this framework, a defendant invoking *Garrity* protection must establish two elements. First, the defendant must show that he or she subjectively believed his statements were compelled by the threat of a substantial employment penalty. Second, the defendant must show that this belief was objectively reasonable under the totality of the circumstances. *Friedrick*, 842 F.2d at 395; *McKinley*, 404 F.3d at 435-36.

This approach faithfully implements the Supreme Court's instruction in *Murphy* that a penalty situation may arise "either expressly or by implication." It also ensures that *Garrity* protection extends only to circumstances in which the government, acting as employer, has effectively linked the exercise of the Fifth Amendment privilege to a threatened adverse employment consequence. *Murphy*, 465 U.S. at 435.

The mere fact that a public employee is questioned in a criminal investigation does not, standing alone, trigger *Garrity* protection. A penalty situation arises only when the government, acting in its capacity as employer, communicates—either expressly or by implication—that the employee's invocation of the Fifth Amendment will result in a substantial employment penalty. *Murphy*, 465 U.S. at 435, 437. Without such a government-created link between silence and an adverse employment consequence, the privilege must be affirmatively invoked, and the resulting statements are not considered compelled within the meaning of *Garrity*. *See United States v. Smith*, 821 F.3d 1293, 1302 (11th Cir. 2016).

With these principles in mind, we turn to the Defendant's claim that his June 18 statements were obtained in violation of *Garrity*.

### 4. Application

#### a. The Defendant's Subjective Beliefs

Turning first to the subjective element, the question is whether the Defendant subjectively believed, at the time of the FBI interviews, that remaining silent would result in an adverse employment consequence. To satisfy this element, defendants must demonstrate through credible testimony that they genuinely held such a belief—not merely that they operated under general professional pressure to cooperate. *See Friedrick*, 842 F.2d at 395; *United States v. Hill*, No. 1:09-CR-199-TWT, 2010 WL 234798, at *9 (N.D. Ga. Jan. 13, 2010). We are also mindful that coercion and deception are not mutually exclusive; the Supreme Court in *Murphy* treated a defendant's conduct during questioning as "relevant" to the subjective inquiry without treating it as independently dispositive. *See Murphy*, 465 U.S. at 437-38. A person operating under genuine coercive pressure may still make deliberate choices about what to say and what to withhold. We apply these principles here.

The trial court found that the Defendant had no reservation about lying to Special Agent Shields, despite knowing that doing so constitutes a federal crime, and that this conduct reflected the Defendant's "ability to make a rational choice" during the interviews. The Defendant disputes these findings, asserting that he participated in the FBI interviews only because he believed remaining silent would result in adverse employment consequences, including termination. We conclude that the record supports the trial court's findings.

A general professional inclination to cooperate is not the same as a sincere belief that remaining silent will cost one's employment. The existence of the former does not establish the latter. *See Hill*, 2010 WL 234798, at \*7 (distinguishing between a defendant who "considered it part of his job to submit to the interview" and one who believed "he would lose that job, or be significantly sanctioned, if he refused"). Moreover, the circumstances surrounding the Defendant's participation provide an independent and competing explanation for his conduct: it is just as reasonable to infer that his decision to cooperate was motivated by an awareness of the evidence against him as by any employment-related pressure. *See United States v. Van Buren*, No. 1:16-CR-243-ODE-JFK, 2017 WL 814258, at \*7, \*9 (N.D. Ga. Jan. 11, 2017) (finding that explaining the strength of the evidence to a defendant and affording him the opportunity to cooperate did not constitute improper inducement, and declining to speculate about the defendant's reasons for cooperating where the record was silent on that point), *report and recommendation adopted* 2017 WL 810285 (N.D. Ga. Mar. 1, 2017).

The Defendant's own testimony at the hearing reinforces the inference of his awareness of the evidence against him and undermines his claim of compulsion. On cross-examination, the Defendant confirmed that he denied filming his stepdaughter when directly asked and acknowledged that the denial was false. He further explained that the lie was "the chance [he] was willing to take . . . to protect [his] family." He also acknowledged that he understood the interview to be criminal, rather than administrative, in nature. A defendant who understands that he is participating in a criminal interview, gives false answers to protect his personal interests, and later characterizes that choice as a calculated risk provides limited support for a claim that he believed silence was unavailable.

The trial court's conclusion is further supported by the Defendant's conduct the following day. When the THP administered an explicit *Garrity* admonition, thereby removing any legitimate basis for the employment penalty he claimed to fear, the Defendant chose termination over cooperation. On this record, we agree with the trial court

that the Defendant's decision to participate in the FBI interviews appears more consistent with a deliberate personal choice than with a genuine belief that silence would cost him his job.

The Defendant has not carried his burden of establishing, through credible testimony, that he subjectively believed his participation was compelled by a threat of substantial employment penalty. As such, the Defendant's claim that his statements were compelled under *Garrity* fails on the subjective element alone.

### b.      The Objective Reasonableness of the Defendant's Beliefs

The Defendant's failure to establish the subjective element is sufficient to resolve the claim. However, because this case presents a question of first impression for Tennessee courts, we also address the objective element. That analysis likewise confirms that the trial court correctly denied the motion to suppress.

The objective inquiry asks whether a reasonable employee in the Defendant's position would have believed that invoking the Fifth Amendment during the FBI interviews would result in a substantial employment penalty. *See Murphy*, 465 U.S. at 435; *McKinley*, 404 F.3d at 436 n.20. The question, therefore, is whether the THP—acting as the Defendant's employer—communicated, expressly or by implication, that his continued employment depended on cooperating with the FBI investigation.

We evaluate that question in light of the totality of the circumstances. *See McKinley*, 404 F.3d at 436 n.20; *United States v. Vangates*, 287 F.3d 1315, 1322 (11th Cir. 2002). Several considerations are relevant here: whether any employment consequences were communicated; the department's policies governing invocation of the Fifth Amendment; the context of the investigation; and the operational relationship between the FBI investigation and the THP's authority as the Defendant's employer.

### i.      The Absence of Any Communicated Employment Consequence

The first consideration is whether the THP communicated any adverse employment consequences for invoking the privilege. The indispensable predicate for *Garrity* protection is that the government, acting in its capacity as employer, created a link between

the exercise of the privilege and a threatened employment penalty. *Garrity*, 385 U.S. at 497-98; *Murphy*, 465 U.S. at 435. On this record, that predicate is absent.

The undisputed facts establish the absence of any such communication. No one told the Defendant that his cooperation with the FBI was a condition of his continued employment. Indeed, Captain Ray testified that the THP never ordered the Defendant to cooperate with the FBI's investigation. No THP supervisor was present during either interview. The FBI itself had no authority over the Defendant's employment status, could not sanction him, and did not purport to do so. The trial court found expressly that no discussion of the Defendant's employment occurred during either session and that the THP had no participation in the FBI interview. Those findings are supported by the interview record and by a preponderance of the evidence.

The Defendant argues that the THP's decision to serve the discretionary leave notice immediately before the interview commenced created an implied link between the two events sufficient to transform the FBI questioning into a penalty situation. That argument would require an inference that the record does not support.

The trial court found as a factual matter that the THP placed the Defendant on leave for safety reasons. Those reasons arose from the concurrent execution of a residential search warrant. The court further found that this action was not taken to pressure the Defendant to cooperate with the FBI. Captain Ray testified that placing an employee on discretionary leave upon the initiation of any criminal investigation was the THP's standard departmental practice. It was not a circumstance-specific signal directed at this Defendant. The Defendant has not demonstrated that the evidence in the record preponderates against these findings.

A leave notice served under standard departmental procedures, even one served shortly before an FBI interview, does not by itself create an implied penalty situation under *Murphy*. *See United States v. French*, 216 F. Supp. 3d 771, 776 (W.D. Tex. 2016) (finding no objectively reasonable belief of compulsion where placement on administrative leave and relinquishment of equipment was standard procedure and no one indicated the officer's job would be in any greater jeopardy for refusing to answer), *aff'd*, 708 F. App'x 205 (5th Cir. 2018); *see also Trevino*, 215 F. App'x at 321 (finding the same; supervisors not present and never indicated job would be in any greater jeopardy if officer failed to cooperate). Where there is no direct threat, the mere possibility of future discipline, however understandably perceived, is not enough to trigger *Garrity* protection. *Smith*, 821 F.3d at 1302.

### ii. The THP's Policies and Procedures

A second consideration concerns the THP's policies and practices regarding the invocation of the Fifth Amendment during outside criminal investigations. A distinguishing feature of this case is not merely the absence of an express threat to the Defendant's employment, but that the THP's policies expressly protected the Defendant's right to invoke the Fifth Amendment without an adverse employment consequence.

Captain Ray testified on redirect examination that the THP policy explicitly permits an employee who is the subject of an outside criminal investigation to invoke the Fifth Amendment without adverse employment consequence. He further testified that this policy is communicated to every trooper at the training academy and that each employee is required to acknowledge the policy in writing, with that acknowledgment maintained in departmental records. The Defendant was a twenty-three-year THP veteran who acknowledged general familiarity with *Garrity* protections at the suppression hearing. These policies and practices cut against any inference that the THP's conduct on June 18 was calibrated to coerce the Defendant's cooperation with the FBI's criminal investigation.

We do not rest the objective conclusion on the policy alone, nor do we hold that an employee's awareness of a protective policy, without more, is sufficient to neutralize circumstances that are pressure-laden in fact. The policy is one significant consideration in the overall picture, operating alongside the other considerations we identify. *See United States v. Nesbitt*, No. 18-20703-CR, 2019 WL 1472284, at \*4 (S.D. Fla. Mar. 12, 2019) (finding no *Garrity* violation, in part, where defendant was familiar with the agency's disciplinary procedures and processes for internal investigations), *report and recommendation adopted*, No. 18-CR-20703, 2019 WL 1470246 (S.D. Fla. Apr. 3, 2019); *Hill*, 2010 WL 234798, at \*8 (finding no objectively reasonable belief of compulsion where departmental policy "did not require an employee to answer a question where the answer would violate his constitutional rights, and no person or policy required Defendant to waive his Fifth Amendment rights").

The Defendant argues, in effect, that the THP's failure to reiterate its protective policy on the morning of June 18 is itself evidence of an implied penalty situation. That argument, however, extends beyond what the doctrine supports. Under *Murphy*, the government must avoid creating a penalty situation. It need not affirmatively reassure an employee that invoking the privilege will carry no employment consequence when no penalty situation otherwise exists.

- 16 -

Consistent with that principle, an employer does not implicitly threaten an employee merely by declining to restate a written policy protecting the right to remain silent, so long as the employer's conduct accords with that policy and its standard procedures. To hold otherwise would effectively require public employers to administer a formal rights advisement before every criminal interview conducted at any facility associated with the employer. That obligation finds no support in *Garrity* or *Murphy*.

### iii.    The Context of the Investigation

A third consideration concerns the context of the investigation and the nature of the alleged conduct. *Garrity* does not protect a public employee from the employment consequences of criminal misconduct. It prohibits the government from using the threat of those consequences to compel the employee to incriminate himself. *See Van Buren*, 2017 WL 814258, at *5 n.9. The nature of the alleged conduct is therefore relevant to whether the surrounding circumstances would lead a reasonable employee to perceive employer-directed compulsion, as distinct from the employee's concern that criminal conduct may have professional consequences.

With that limitation in mind, the nature of the alleged conduct can bear on whether an employee would reasonably believe that cooperation was required as a condition of employment. When an investigation concerns conduct arising from an employee's official duties, the employer may have a direct institutional interest in obtaining answers about workplace conduct. The employee may reasonably perceive that expectation as connected to his or her professional obligations. In that setting, the surrounding circumstances may more readily suggest that the employer expected cooperation and that refusal could carry employment consequences.

Indeed, cases finding *Garrity* violations typically present this configuration precisely: officers questioned by their own department about conduct arising directly from the exercise of their law enforcement authority. In *Camacho*, the court suppressed statements where departmental investigators questioned officers at their police station about the death of a person in their custody during an on-duty arrest. *See United States v. Camacho*, 739 F. Supp. 1504, 1505-07, 1516-17 (S.D. Fla. 1990). The investigation concerned conduct at the core of the officers' official duties, and the department's own investigators conducted the questioning under circumstances that affirmatively communicated an expectation of cooperation.

This case is materially different. The trial court found expressly that "the actions at issue during the two interviews in no way involved actions taken by Defendant while on duty or within the scope of his employment." The record supports that finding, and the Defendant has not demonstrated that the evidence preponderates against it. The criminal investigation concerned alleged conduct wholly unrelated to the Defendant's official duties as a THP trooper. In that context, the investigation is more appropriately understood as a criminal inquiry into private conduct rather than an employer-directed effort to obtain answers about job-related misconduct.

That distinction informs the objective analysis. When alleged misconduct is unrelated to an employee's official duties, the basis for inferring that the employer expected cooperation with a criminal investigation is substantially weaker. In the totality of the circumstances here, the private nature of the alleged conduct further undermines any reasonable basis for concluding that the THP conveyed a condition of continued employment.

### iv.     The FBI's Operational Separation from the THP

Finally, the Defendant contends that, regardless of the nature of the alleged conduct or the absence of an express threat, the sequence of events on June 18 demonstrates a degree of institutional coordination between the THP and the FBI sufficient to create a *Garrity* penalty situation on its own terms. A fourth consideration, therefore, concerns the operational relationship between the FBI investigation and the THP's authority as the Defendant's employer, and it is to that argument that we now turn.

Courts have recognized that the investigating agency need not be the defendant's direct employer for *Garrity* to apply. It is sufficient if the investigating agency has a relationship with the employer that allows it to apply employment pressure to compel cooperation. *Goodpaster*, 65 F. Supp. 3d at 1025. Relying on that principle, the Defendant contends that the THP's logistical facilitation of the FBI interview placed the FBI within reach of the *Goodpaster* rule. He points to the scheduling of the interview at the THP headquarters and the service of the leave notice immediately beforehand. He further argues that these facts establish the requisite coordination despite the absence of formal authority over the THP employment decisions. In our view, however, two considerations foreclose that inference on this record.

First, the doctrinal predicate present in *Goodpaster* is absent here. In *Goodpaster*, the investigating agency was the United States Postal Service Office of Inspector General.

That agency possessed both criminal investigative authority and formal authority to initiate disciplinary proceedings against postal employees within the same regulatory framework. The agency's dual authority created the impermissible pressure because an employee could reasonably conclude that refusing to cooperate in the criminal investigation would trigger internal discipline. *Goodpaster*, 65 F. Supp. 3d at 1025-26.

No comparable authority exists here. The FBI has no authority to discipline, demote, or terminate THP troopers. The THP likewise has no authority to direct the FBI's criminal investigation. The trial court found that the relationship between the agencies consisted of a single THP member assigned to a ten- to twelve-member FBI task force. The court further found that the presence of that member was "of no consequence to the interviews which were taken." Special Agent Shields testified that he supervised the task force and that the THP's involvement was limited. These findings are supported by the record and are entitled to deference. Federal decisions involving FBI interviews of state law enforcement officers reinforce this conclusion. *See Trevino*, 215 F. App'x at 321; *French*, 216 F. Supp. 3d at 776-77; *Nesbitt*, 2019 WL 1472284, at *4-5; *United States v. Callahan*, No. 1:10-CR-353-WSD, 2011 WL 4479204, at *4 (N.D. Ga. Sept. 26, 2011).

These decisions do not impose formal employment authority as a threshold requirement. Instead, they identify circumstances relevant to the objective inquiry. The central question remains whether a reasonable employee would perceive a credible link between silence and an employment penalty. Where no such link is communicated, the absence of employer participation and the FBI's lack of employment authority strongly negate any reasonable perception of compulsion. *See Vangates*, 287 F.3d at 1323 (recognizing that a general directive to cooperate is not sufficiently coercive to create an objectively reasonable belief that an employee would be sanctioned for invoking Fifth Amendment rights).

Second, the record affirmatively shows that the FBI investigation remained separate from the THP's employment authority in the way that matters here: neither agency communicated that the Defendant's job depended on his cooperation. Captain Ray, who informed the Defendant that he had been placed on administrative leave, testified that the THP had no supervisory authority over the FBI task force and that he was unaware of the FBI's interview plans that morning. Special Agent Shields, who conducted the interview on behalf of the FBI, testified that he was unaware of the THP's decision to place the Defendant on discretionary leave and that he had no knowledge of any planned employment action. No THP representative was present for either interview, and no employment consequences were discussed during either session. Nothing communicated

during the interviews would have led a reasonable person in the Defendant's position to believe that his continued employment depended on his participating in the questioning. *Murphy*, 465 U.S. at 435.

The Defendant raises one additional coordination argument that warrants direct attention. At trial, the Defendant testified that Trooper Seitner, who was assigned to the FBI task force, entered the interview room to serve a search warrant for the Defendant's phone. When Trooper Seitner did so, the Defendant noticed that the trooper was also the affiant for the warrant. From this observation, he concluded that the THP "was conducting all of it." The Defendant argues that this perception reinforced his belief that the THP and the FBI were operating as a single investigative authority.

The record does not support that inference. Special Agent Shields testified that he was unaware that Trooper Seitner was the warrant affiant and that the decision to use the trooper in that role was never discussed between the agencies. The Defendant's interpretation that the THP was directing the investigation is inconsistent with the uncontradicted testimony regarding the investigative chain of command.

The Defendant formed this perception only after observing the warrant during the FBI interview, not during the earlier administrative encounter in which the THP personnel placed him on discretionary leave. The constitutional inquiry under *Murphy* asks whether the employer communicated that invoking the privilege would result in an employment penalty. The Defendant's mid-interview inference from the identity of the warrant affiant does not establish such a communication. The impression, however understandable in the moment, was not created by any statement or action linking the Defendant's cooperation to his employment.

Each of these grounds independently forecloses the Defendant's reliance on *Goodpaster*. The first is doctrinal: the FBI lacked the combined criminal investigative and internal disciplinary authority that created the impermissible pressure in *Goodpaster*. An agency without authority over the Defendant's employment could not credibly condition that employment on his cooperation. The second is factual: the record affirmatively shows that neither agency communicated to the other or to the Defendant that his employment depended on participating in the FBI's questioning. Either ground alone defeats the argument; together, they make the conclusion unavoidable.

Considered with the other circumstances discussed above, the operational separation between the FBI investigation and the THP's employment authority confirms

that no penalty situation arose here. The circumstances the Defendant faced on the morning of June 18 may have been difficult for him. But they did not communicate that the exercise of his Fifth Amendment privilege would carry an adverse employment consequence—the constitutional threshold identified in *Garrity*.

### 5. Conclusion on the *Garrity* Claim

In summary, *Garrity* protects public employees when the government requires them to choose between self-incrimination and an adverse employment consequence. A penalty situation arises only when the government, acting as employer, creates it; it does not arise simply because an employee fears that a criminal investigation may affect his or her career.

For the reasons given above, we hold that the Defendant has not established that he subjectively believed his participation was compelled by the threat of a substantial employment penalty. Nor has he established that such a belief would have been objectively reasonable under the totality of the circumstances. Because the record does not support the Defendant's claim that his statements were compelled, we conclude that the trial court properly denied his motion to suppress.

## C. CELL PHONE EVIDENCE

The Defendant next raises several challenges related to the digital evidence associated with his cell phone. First, he argues that the images and recordings were not properly authenticated. Second, he asserts that the jury heard forensic evidence without testimony from a qualified expert. Third, he contends that the State failed to establish that the charged offenses occurred within the applicable statute of limitations. Finally, he argues that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose an alleged second Cellebrite report or related chain-of-custody information. The State responds that the images and recordings were properly authenticated, that no expert testimony was required to admit them, that the proof established timely prosecution, and that no *Brady* violation occurred.

We address these arguments in turn.

### 1. Background

As background for this issue, J.M. initially accessed the Defendant's cell phone using the Defendant's passcode. When she opened the phone's photo application, she found nude images of her daughter and then located additional photos in the phone's "favorites" folder. At trial, J.M. identified the phone recovered by law enforcement as the Defendant's phone, explaining that she had seen it "too many times to count" and recognized it by its case.

After J.M. reported what she had found, FBI Special Agent Carla Rexing became involved in the investigation. Special Agent Rexing reviewed the materials J.M. had located on the Defendant's phone and continued the investigation. On June 18, 2020, Special Agent Rexing searched vehicles under the Defendant's control. In the Defendant's patrol vehicle, she found the cell phone at issue. Special Agent Rexing testified that she conducted an "on-scene preview," which she described as reviewing the phones and conducting an extraction at the scene rather than taking the devices back to a lab. She further testified that she used Cellebrite, a forensic extraction technology, to perform the on-scene extraction.

After this initial extraction, Special Agent Rexing turned the phone over to Homeland Security Investigations ("HSI") because the on-scene extraction had limited capabilities and HSI had a tool capable of performing a "deeper dive into the phone." At HSI, forensic examiner Dave Thomas performed the advanced extraction while Special Agent Rexing remained present. When that process was complete, Special Agent Rexing took both the phone and a copy of the extraction back to the FBI office.

At trial, the State sought to qualify Special Agent Rexing as an expert in Cellebrite technology. After a voir dire examination concerning her training and qualifications, the trial court sustained the Defendant's objection, ruling that Special Agent Rexing could not be tendered as an expert in that area. The trial court also declined to allow the State to introduce a Cellebrite extraction report into evidence through Special Agent Rexing.

However, the State introduced additional evidence regarding the phone's contents. Special Agent Rexing identified the phone seized on June 18, 2020, testified that it had remained in evidence storage, and explained that no one else had signed the chain of custody for it. She then unlocked the phone using the passcode, showed the phone settings displaying the Defendant's name, and navigated through the phone's photo and video galleries for the jury.

Additionally, J.M. and the victim identified the images and videos shown at trial. J.M. testified that the videos admitted into evidence were the same videos she had sent to herself from the Defendant's phone when she had first discovered them. The victim identified the room and bathroom depicted in the video, recognized the Defendant in the mirror reflection at the beginning of the video, and identified herself as the person depicted in the shower.

Trooper Seitner also testified regarding the cell phone evidence. During direct examination, he was asked what he learned about the search of the Defendant's phone, to which he responded that the images downloaded from the Defendant's phone "were consistent with the videos" that they saw on J.M.'s phone originally. Later, on cross-examination, defense counsel pursued this line of questioning by specifically asking about the images on the Defendant's phone. Further, defense counsel asked Trooper Seitner about Cellebrite and the reports that would be produced.

The Defendant later alleged that a "second report" arose from Special Agent Rexing's testimony that Mr. Thomas performed the more advanced extraction and that she took back a copy of that extraction after the process was complete. However, there was no testimony from Mr. Thomas at any stage in the proceedings, and no second Cellebrite extraction report was admitted into evidence.

## 2. Authentication of the Images and Recordings

The Defendant first argues that the trial court erred by allowing the jury to consider the images and recordings associated with his cell phone. As we understand the argument, he asserts that the State could not authenticate this evidence without expert testimony concerning the Cellebrite extraction process, particularly after the trial court declined to qualify Special Agent Rexing as an expert in that field.

The State responds that the Defendant waived this issue by failing to object when the phone, images, and recordings were admitted at trial. The State further argues that the evidence was authenticated through witnesses with personal knowledge and that the Defendant cannot establish plain error. We agree with the State.

We begin with whether the Defendant has preserved this issue for appellate review. Generally, before a party may raise an issue on appeal, the party must preserve that issue by raising it in the trial court. *See State v. Gardner*, 716 S.W.3d 388, 416 (Tenn. Crim. App. 2024). To preserve an issue for plenary review, a defendant must raise a timely and

specific objection in the trial court and later present the same ground in a timely, written motion for a new trial. *State v. Ruiz*, 716 S.W.3d 439, 453 (Tenn. Crim. App. 2024). A motion for a new trial cannot revive an issue that was not preserved by a contemporaneous objection. *See State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020). Absent both steps, the party waives plenary review of the issue on appeal. *Ruiz*, 716 S.W.3d at 453.

The requirement of a contemporaneous objection serves important purposes. It gives the trial court "an opportunity to address and/or correct the issue immediately." *State v. Walls*, 537 S.W.3d 892, 900 (Tenn. 2017). It also places the opposing party on notice that the party may need to take corrective action, offer additional proof, or "develop fully [its] opposing positions on an issue." *State v. Minor*, 546 S.W.3d 59, 65 (Tenn. 2018); *State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *4 (Tenn. Crim. App. July 14, 2023), *no perm. app. filed*. For these reasons, this court has been "extremely hesitant to put a trial court in error where its alleged shortcoming has not been the subject of a contemporaneous objection." *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000).

In this case, the Defendant filed a pretrial motion in limine seeking to require the State to present a qualified expert in Cellebrite extraction technology before introducing evidence derived from a Cellebrite report. After the trial court declined to qualify Special Agent Rexing as an expert in that field, the Defendant renewed his motion for judgment of acquittal, arguing that the images and videos lacked forensic authentication. However, the Defendant did not object when the State introduced the cell phone through J.M. Nor did he object when the State introduced the videos and images that J.M. identified as the same materials she had seen on the Defendant's phone. In both his motion in limine and his renewed motion for judgment of acquittal, the Defendant argued that the evidence was not authenticated forensically, but he did not explain why the testimony from J.M. and the victim were insufficient to authenticate the Defendant's phone and its contents.

We need not decide whether the motion in limine or the renewed motion for judgment of acquittal preserved this issue for plenary review. Even assuming that the issue was preserved, the Defendant has not shown that the trial court abused its discretion in allowing the jury to consider the images and videos associated with the phone. Tennessee Rule of Evidence 901(a) requires only "evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." One method of authentication is testimony from a witness with knowledge "that a matter is what it is claimed to be." Tenn. R. Evid. 901(b)(1). We review a trial court's determination that

evidence has been properly authenticated for an abuse of discretion. *See Gardner*, 716 S.W.3d at 422.

This court has recognized that video evidence is "authenticated the same way as photographs." *Gardner*, 716 S.W.3d at 422. To that end, "[a] photograph can [be] authenticated by proof that it depicts what it is claimed to depict, Rule 901(a)." Neil P. Cohen et al., *Tennessee Law of Evidence* § 4.01[21][e] (7th ed. 2024) (internal quotation marks omitted). Importantly,

> [i]t is not necessary . . . that the witness through whom a photo is being introduced was also the photographer who took the photo in question. Any person, whether or not the photographer, familiar with the place or item that was photographed can authenticate the picture by testifying that it is a true and accurate depiction of the location or item at issue in the case.

*Id.*

The State introduced sufficient evidence to satisfy these requirements. J.M. testified that she recognized the phone by its case, having seen it "too many times to count," and that she accessed it using the Defendant's passcode. She opened the phone's photo application, observed images and recordings of her daughter, and later identified the videos admitted at trial as the same recordings she had sent to herself from the Defendant's phone when she first discovered them.

The victim's testimony further supported the authenticity of the recordings. She identified herself in the recordings, identified the bathroom and room depicted in them, and recognized the Defendant in a mirror reflection visible at the beginning of one video. The Defendant's own admissions also corroborated the origin of the recordings. He admitted to using the ceiling holes above the victim's bathroom to view and record her. Because the State introduced the phone, images, and recordings through witnesses with personal knowledge, and because the Defendant's admissions confirmed that he made the recordings in the location depicted, we cannot conclude that the trial court erred in finding the evidence to be sufficiently authenticated for admission. *See Gardner*, 716 S.W.3d at 423.

The Defendant argues, however, that expert testimony was necessary because the evidence came from a cell phone and because the State sought to introduce Cellebrite-related evidence. We respectfully disagree. Rule 901 does not require authentication through the most technical or conclusive form of proof available. It requires only sufficient

evidence to permit a reasonable juror to find that the item is what the proponent claims. In this context, the testimony from J.M. and the victim, together with the Defendant's own admissions, supplied the threshold showing.

Although forensic metadata or expert testimony may be used to authenticate digital evidence, Tennessee law does not make such proof a required or exclusive means of authentication. *See* Tenn. R. Evid. 901(b). Remaining concerns about the source, reliability, or completeness of the digital evidence went to the weight of the evidence, not its admissibility. *See State v. Spivey*, No. M2018-00263-CCA-R3-CD, 2020 WL 598347, at *12 (Tenn. Crim. App. Feb. 7, 2020), *perm. app. denied* (Tenn. June 3, 2020). The Defendant is not entitled to relief on this ground.

### 3. Cellebrite-Related Testimony and the Absence of Expert Proof

The Defendant next invokes the same expert-testimony theory in a different evidentiary context. He does not merely argue that the images and recordings lacked authentication. He also appears to argue that, because the trial court declined to qualify Special Agent Rexing as an expert in Cellebrite extraction technology, the State could not present other testimony referencing information obtained through the Cellebrite process. Specifically, he challenges Trooper Seitner's testimony that the images downloaded from the Defendant's phone were consistent with the videos initially viewed on J.M.'s phone. He characterizes this testimony as forensic in nature and contends that it could not be presented to the jury without expert testimony.

We conclude that this argument is not preserved for plenary review. Unlike the Defendant's challenge to Special Agent Rexing's expert qualification, this claim concerns testimony that Trooper Seitner gave earlier in the trial without objection. Because the Defendant did not object when that testimony was offered, the trial court was not asked to rule on its admissibility, and the State was not asked to supply additional foundation or clarify the basis for admission.

As discussed above, plenary review generally requires a timely and specific objection in the trial court and a later assertion of the same ground in a timely motion for a new trial. *See Ruiz*, 716 S.W.3d at 453. In this case, the first testimony referencing the Cellebrite report came from Trooper Seitner, and the record does not show that the Defendant objected when the State elicited that testimony. On direct examination, Trooper Seitner testified that Special Agent Rexing "downloaded" the Defendant's phone using the Cellebrite system. He described Cellebrite as a forensic system used to download data

from phones into a report. He also stated that the report from the Defendant's phone contained images and videos consistent with the materials that J.M. had provided to Special Agent Rexing. The Defendant did not object to this testimony, ask that it be stricken, request a limiting instruction, or otherwise ask the trial court to take corrective action at that time.

Indeed, the Defendant then elicited additional testimony about the Cellebrite report and its contents during cross-examination. Defense counsel asked Trooper Seitner whether the Defendant's phone download contained all of the videos that J.M. had provided, whether the report showed that items had been deleted, whether the videos from J.M.'s phone were consistent with videos on the Defendant's phone, whether he saw six separate videos of six separate events, and whether Cellebrite could produce different types of reports.

In response, Trooper Seitner repeatedly qualified the limits of his knowledge. He explained that he was "not an expert" on Cellebrite, was not certified to download phones, and could not answer certain technical questions about Cellebrite reports. Thus, rather than presenting the trial court with a contemporaneous objection to Trooper Seitner's testimony, the Defendant used cross-examination to explore the Cellebrite-related proof and to emphasize the limits of Trooper Seitner's forensic expertise.

The Defendant raised a forensic-authentication argument only later, in his renewed motion for judgment of acquittal, after the proof had closed. By that point, the trial court did not have the opportunity to address the asserted evidentiary error when the testimony was offered. For its part, the State also lost the opportunity to respond by altering its proof, offering additional foundation, or clarifying the basis for admissibility. *See Vance*, 596 S.W.3d at 254; *Walls*, 537 S.W.3d at 900; *Minor*, 546 S.W.3d at 65.

Importantly, the Defendant's successful objection to Special Agent Rexing's expert qualification did not preserve a separate challenge to Trooper Seitner's earlier testimony. The trial court sustained the Defendant's objection to Special Agent Rexing's qualification and prevented the State from introducing the Cellebrite extraction report through her. That ruling did not retroactively preserve an unmade objection to testimony that had already been admitted without objection and then explored further on cross-examination.

Accordingly, we conclude that the Defendant has waived plenary review of this issue. In addition, because the Defendant does not request review of this issue for plain

error, we respectfully decline to address the issue sua sponte. *See Gardner*, 716 S.W.3d at 417. The Defendant is not entitled to relief on this ground.

### 4.      Timely Commencement of the Prosecution

The Defendant's next argument extends his expert-proof theory from authentication to the statute of limitations. He contends that, without expert testimony establishing when the images and recordings were created, the State failed to prove that the prosecution was commenced within the applicable limitations period. We respectfully disagree.[2]

At the time of the charged offenses, both unlawful photography and observation without consent were Class A misdemeanors as alleged here. *See* Tenn. Code Ann. §§ 39-13-605(d)(1), -607(d)(1) (2018).[3]  A misdemeanor prosecution must generally be commenced within twelve months after an offense is committed. *See id.* § 40-2-102(a) (2018). For purposes of the limitations period, a prosecution may be commenced by the issuing of a warrant or the finding of an indictment or presentment. *See id.* § 40-2-104 (2018).

When a defendant raises a statute-of-limitations issue, the State need not prove timely commencement beyond a reasonable doubt. Instead, "time limitations need be proven only in cases where those issues are raised by the defendant," and, once raised, "the state must prove . . . timely prosecution by a preponderance of the evidence." *State v. Jameson*, No. M2020-00945-CCA-R3-CD, 2021 WL 3360976, at *6 (Tenn. Crim. App. Aug. 3, 2021), *no perm. app. filed*; *see also* Tenn. Code Ann. § 39-11-201(f) (2018), Sentencing Comm'n Cmts. Thus, the question is whether the State established, by a preponderance of the evidence, that the charged offenses were committed within the twelve months preceding the issuance of the arrest warrant.

---

[2]      As an initial matter, we recognize that the record may raise waiver issues with respect to this statute-of-limitations claim. However, neither party has framed the appeal in that manner. The Defendant argues only that the State failed to prove timeliness, and the State responds to the claim on those terms without raising other threshold issues. Accordingly, we assume without deciding that the claim is properly before us, and we do not address whether Tennessee law would treat an unpreserved statute-of-limitations defense in the same manner as federal law. *Cf. Musacchio v. United States*, 577 U.S. 237, 248 (2016).

[3]      The offense classification for unlawful photography has since been amended to designate the base offense as a Class E felony. *See* Tenn. Code Ann. § 39-13-605(d) (2025). We consider the limitations period as applied to the statute in effect at the time the offenses were committed.

The arrest warrant in this case was issued on March 5, 2021. Accordingly, the State was required to establish by a preponderance of the evidence that the charged offenses occurred on or after March 5, 2020. The State satisfied that burden through a combination of the dates displayed on the recordings and the Defendant's own statements about when the recordings were made.

The recordings themselves supplied the month and day they were taken. Specifically, some exhibits displayed dates associated with the recordings, including a March 25 date visible on the video of the Defendant's phone that J.M. recorded. Although that date did not include the year, the Defendant's June 18, 2020, FBI interview supplied the missing year. During that interview, the Defendant was questioned about the videos of the victim found on his phone. In that context, he stated that the victim was eighteen when the videos were recorded and that the videos had been made within the preceding year. Because the interview occurred in June 2020, a March 25 video from the preceding year could only have been recorded on March 25, 2020. Moreover, J.M.'s testimony that the victim was eighteen in March 2020 and in her senior year of high school further corroborated that timeframe.

The absence of expert testimony or forensic metadata does not change this conclusion. The State could establish the timeliness of the prosecution through the recordings themselves and through other competent evidence bearing on their date. Any remaining concern about the absence of forensic dating evidence would have affected the weight of the proof, not whether the State satisfied its burden to show that the prosecution was timely commenced.

Accordingly, the State established by a preponderance of the evidence that the charged conduct occurred on March 25, 2020. Because the prosecution commenced within twelve months of that date, the Defendant is not entitled to relief on this ground.

### 5. Alleged Second Cellebrite Report and Chain-of-Custody Information

The Defendant next raises a separate due process claim under *Brady v. Maryland*, 373 U.S. 83, 87 (1963). He contends that Special Agent Rexing's testimony about the HSI extraction shows that Forensic Examiner Dave Thomas performed an additional extraction of the Defendant's cell phone and that a second Cellebrite report must therefore exist. The Defendant also asserts that the State failed to disclose chain-of-custody information related to the phone.

The State responds that the record does not establish that a second Cellebrite report ever existed and, therefore, that no *Brady* violation occurred. We agree with the State.

### a.       Standard of Appellate Review

Whether a defendant has shown the presence of a *Brady* violation "presents a mixed question of law and fact." *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004). As this court has recognized,

> The lower court's findings of fact, such as whether the defendant requested the information or whether the state withheld the information, are reviewed on appeal de novo with a presumption that the findings are correct unless the evidence preponderates otherwise. The lower court's conclusions of law, however, such as whether the information was favorable or material, are reviewed under a purely de novo standard with no presumption of correctness.

*Id.*; *State v. Bridges*, No. W2024-00528-CCA-R3-CD, 2025 WL 354638, at *8 (Tenn. Crim. App. Jan. 31, 2025), *perm. app. denied* (Tenn. Aug. 8, 2025).

### b.       *Brady* Analysis

In *Brady v. Maryland*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *see also Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As our supreme court has recognized,

> To establish a Due Process violation based on *Brady*, a defendant must show that: (1) the defendant requested the evidence (unless the evidence is obviously exculpatory, in which case the prosecution is bound to produce the information, without a request); (2) the State suppressed evidence in its possession; (3) the suppressed evidence was favorable to the defendant; and (4) the evidence was material.

*State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014) (citing *Johnson*, 38 S.W.3d at 56). Importantly, "[a]ll of the *Brady* requirements must be met in order to show a *Brady*

- 30 -

violation." *Anderson v. State*, 726 S.W.3d 170, 179 (Tenn. Crim. App. 2025). "The burden of proving a *Brady* violation rests with the defendant, and the violation must be proven by a preponderance of the evidence." *State v. Dotson*, 450 S.W.3d 1, 94 (Tenn. 2014).

As part of that burden, a defendant must first establish that the allegedly suppressed evidence existed in the first instance. *See, e.g.*, *State v. Brown*, No. W2022-01188-CCA-R3-CD, 2023 WL 6459814, at *8 (Tenn. Crim. App. Oct. 4, 2023) ("[N]o *Brady* claim may proceed unless the defendant first shows that the withheld evidence existed."), *perm. app. denied* (Tenn. Mar. 6, 2024). After all, the State's disclosure obligation under *Brady* cannot extend to evidence that never existed. *See State v. Ivory*, No. M2020-01458-CCA-R3-CD, 2021 WL 4955665, at *16 (Tenn. Crim. App. Oct. 26, 2021), *perm. app. denied* (Tenn. Mar. 23, 2022). Similarly, a defendant cannot establish a *Brady* violation by relying on speculation that undisclosed evidence may have existed or may have been favorable. *See State v. Hacker*, No. 165, 1988 WL 118088, at *10 (Tenn. Crim. App. Nov. 7, 1988) (declining to "engage in conjecture, speculation or to guess what . . . materials the assistant district attorney general suppressed absent a showing that such materials existed").

In this case, the Defendant has not shown that a second Cellebrite report ever existed. Special Agent Rexing testified that she performed an initial extraction of the phone and then took the device to another federal agency because the first extraction had limited capabilities. At HSI, Mr. Thomas performed a deeper extraction while Special Agent Rexing remained present, and Special Agent Rexing returned to the FBI office with the phone and a copy of the extraction. This testimony established that HSI performed a more advanced extraction and that Special Agent Rexing received a copy of that extraction. But it did not establish that HSI generated a separate Cellebrite report, that the State possessed such a report, or that any report contained favorable and material information.

The Defendant's argument rests on the premise that, because a deeper extraction occurred, a second Cellebrite report must have been created. But the record does not support that premise. The Defendant points to no testimony from Special Agent Rexing, Mr. Thomas, or any other witness establishing that a separate report was created. Nor does the record contain any proof that the State possessed such a report and failed to disclose it. A *Brady* claim requires more than speculation or an unsupported inference that undisclosed evidence might exist. *See State v. Allen*, No. E2022-00437-CCA-R3-CD, 2023 WL 4487704, at *47 (Tenn. Crim. App. July 12, 2023) (rejecting a claim based on "the Defendant's bare assertion"), *perm. app. denied* (Tenn. Feb. 12, 2024). Because the Defendant has not shown that the alleged second report existed or that the State suppressed it, he has not satisfied the threshold requirements for relief under *Brady*.

The Defendant's reference to a chain-of-custody report does not change the analysis. To the extent the Defendant separately asserts that the State failed to disclose chain-of-custody information, he has not identified any undisclosed chain-of-custody report in the record. He also has not shown that the State possessed and suppressed such a report, that the report was favorable to the defense, or that it was material to guilt or punishment. Accordingly, this aspect of the claim fails for the same reason as the alleged second-report claim: the Defendant has not established the existence, suppression, favorability, or materiality of the information at issue.

Because the Defendant has not shown that the State suppressed a second Cellebrite report, a chain-of-custody report, or any other favorable and material evidence, we conclude that he is not entitled to relief on this issue.

### D. CLOSING ARGUMENT

The Defendant next argues that the State made improper statements during the closing argument. Specifically, he asserts that the prosecutor expressed personal beliefs about the Defendant's credibility during closing arguments and made other remarks that constituted prosecutorial misconduct. The Defendant concedes that no objection was made to the statements during the closing argument, but he asserts that the statements nonetheless constitute plain error. The State responds, in part, that consideration of the alleged error is not necessary to do substantial justice. We agree with the State.

#### 1. Background

As background for this issue, the Defendant challenges several of the prosecutor's remarks during closing arguments. Specifically, he identifies multiple instances in which the prosecutor argued that the Defendant lied and should not be believed. Additionally, the Defendant takes issue with the prosecutor's urging the jury to "focus exclusively on the victim," emphasizing the need to secure justice for the victim.

The Defendant also takes issue with remarks the prosecutor made, referring to a voir dire question about parental roles and then asking what the Defendant provided as a parent. He asserts that this encouraged jurors to judge the Defendant on "morality by framing the case as a betrayal of universal parental values, rather than what the jurors should base their verdict on—the facts."

Finally, the Defendant challenges the State's use of the contents of his cell phone during the closing argument, although he does not clearly explain the basis for this claim. It appears that the Defendant contends that the State attempted to establish "sexual gratification by analogy" through its discussion of comments on photographs, internet search history, screenshots, and other images recovered from the phone. Both parties agree that the Defendant did not make a contemporaneous objection to any of these statements during the State's closing arguments.

### 2. Plain Error Analysis

As discussed above, a party generally must preserve an issue by raising a timely and specific objection in the trial court and then presenting the same issue in a motion for a new trial. *See Gardner*, 716 S.W.3d at 416; *Ruiz*, 716 S.W.3d at 453. Because the Defendant did not object to the challenged remarks during the closing argument, plenary review is unavailable. *See id.*

The Defendant does not dispute that he failed to lodge a timely objection to any issue he now raises on appeal. He therefore acknowledges that plenary review is unavailable and instead asks this court to consider the matters under the plain error doctrine. *See Ruiz*, 716 S.W.3d at 453 ("To be clear, a party seeking plain error relief must generally raise and argue the issue in the party's briefing, just as the party would do with all other issues in the ordinary course of an appeal" (citation omitted)).

Our supreme court has recognized that "[u]nlike plenary review, which applies to all claims of error that are properly preserved, plain error review is limited to those errors which satisfy five criteria." *Vance*, 596 S.W.3d at 254. These criteria are as follows:

(a)     the record must clearly establish what occurred in the trial court;

(b)     a clear and unequivocal rule of law must have been breached;

(c)     a substantial right of the accused must have been adversely affected;

(d)     the accused did not waive the issue for tactical reasons; and

(e)     consideration of the error is "necessary to do substantial justice."

*See*, *e.g.*, *State v. Jones*, 589 S.W.3d 747, 762 (Tenn. 2019). The defendant bears the burden of establishing all five factors. *State v. Linville*, 647 S.W.3d 344, 354 (Tenn. 2022). An appellate court "need not consider all of the elements when it is clear from the record that at least one [of] them cannot be satisfied." *State v. Reynolds*, 635 S.W.3d 893, 931 (Tenn. 2021).

Before a defendant may obtain plain-error relief, the defendant must demonstrate that consideration of the alleged error is "necessary to do substantial justice." *See*, *e.g.*, *Jones*, 589 S.W.3d at 762. This requirement limits relief to errors that are "especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). Put differently, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In establishing this factor, the Defendant bears a significant burden: he must show a "significant probability that the jury would have acquitted the Defendant" had the alleged error not occurred. *Vance*, 596 S.W.3d at 256. Where the State's proof is strong, alleged misconduct in the closing argument generally will not satisfy this demanding standard. *See State v. Enix*, 653 S.W.3d 692, 702 (Tenn. 2022).

Closing argument is a valuable part of the adversarial process, and counsel are ordinarily afforded wide latitude in arguing their positions to the jury. *See State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). Even so, the argument must remain grounded in the evidence and the reasonable inferences drawn from it. Prosecutors may not express personal beliefs or opinions about the truth or falsity of testimony, make arguments calculated to inflame the passions or prejudices of the jury, inject broader issues than the guilt or innocence of the accused, or refer to facts outside the record. *See id.* at 6.

We need not decide whether any particular remark crossed the line of proper closing argument. Even assuming, without deciding, that some portion of the State's argument was improper, the Defendant has not shown that correction of the alleged error is necessary to do substantial justice. More specifically, nothing in the record suggests a significant probability that the jury would have acquitted the Defendant had the challenged remarks not been made.

Our review of the record confirms that the State's proof was substantial as to both the acts charged and the Defendant's purpose. As to the acts themselves, J.M. testified that she accessed the Defendant's phone using his passcode and discovered images and videos of the victim. She identified the phone recovered by law enforcement as the Defendant's

phone, explaining that she had seen it "too many times to count" and recognized it by its case. She also testified that the videos admitted at trial were the same videos she had sent to herself from the Defendant's phone when she first discovered them. The victim then identified herself as the person depicted in the recordings, identified the bedroom and bathroom shown in the recordings, and recognized the Defendant in a mirror reflection at the beginning of one video. In addition, the proof showed that holes in the attic provided a view into the victim's shower, and J.M. identified a photograph showing the view from those holes to the bottom of the victim's shower.

The proof was also strong as to the principal disputed issue: whether the Defendant acted for sexual gratification. The Defendant's theory was that he acted from parental concern, not from a sexual purpose. But the jury heard evidence that could reasonably lead it to reject that explanation. The recordings depicted the victim in private locations where she had a reasonable expectation of privacy, including her bathroom and bedroom. The victim identified herself in the recordings and identified the rooms shown in them. The proof also showed a physical means of observing the victim from above the shower through holes in the attic area. And, videos of the victim were also saved in the "favorites" folder on the Defendant's cell phone.

From the nature of the recordings, the victim's state of privacy, the Defendant's possession of the recordings on his phone, and the evidence concerning the view into the shower, the jury could reasonably infer that the conduct was committed for sexual gratification rather than for an innocent parental purpose. Although the Defendant offered a contrary explanation, that explanation rested principally on his own testimony and was not supported by the surrounding circumstances.

Thus, even recognizing that the mens rea was the central disputed issue at trial, the Defendant has not shown that the challenged remarks affected the jury's consideration of the evidence in a way that probably changed the result. The jury heard direct identification evidence from J.M. and the victim, physical evidence concerning the means of observation, and strong circumstantial proof bearing on the Defendant's purpose. In light of this proof, the Defendant has not shown a significant probability that the jury would have acquitted him had the challenged remarks not been made.

We therefore conclude that correction of any alleged error is not necessary to do substantial justice under the fifth plain-error factor. Because the Defendant has failed to establish this factor, we need not address the remaining plain-error factors. *See Reynolds*, 635 S.W.3d at 931. The Defendant is not entitled to relief on this ground.

## E.  SENTENCING

Finally, the Defendant challenges the trial court's sentencing determinations.  He argues that the court erred by denying judicial diversion and an alternative sentence.  He also asserts that the trial court's requirement that he register as a sexual offender was a product of "judicial vindictiveness."

The State responds that the trial court acted within its discretion in denying judicial diversion and alternative sentencing and in requiring the Defendant to register as a sexual offender.  We agree with the State.

### 1.  Background

Following the jury's verdicts, the trial court conducted a sentencing hearing on March 1, 2024.  The State introduced the presentence report and victim-impact statements from four members of the victim's family.  The State also called three family members to testify, including the victim.  These witnesses described the emotional consequences of the Defendant's conduct, including the fear, anxiety, and disruption experienced by the victim and her family.

The Defendant called his older brother as a witness.  He testified that the Defendant served as the primary caregiver for their eighty-nine-year-old mother, who suffered from several health issues.  He explained that the family relied on the Defendant to help care for her.

In announcing its ruling, the trial court stated that it had considered the presentence report, the victim-impact evidence, the evidence presented by both parties, and the arguments concerning judicial diversion, alternative sentencing, and sexual offender registration.  The court found one enhancement factor applicable: that the Defendant abused a position of private trust.  The court also found one mitigating factor applicable under the catch-all provision based on the Defendant's role in caring for his elderly mother.

The court then addressed the Defendant's request for judicial diversion.  It found that the Defendant was not amenable to correction because his trial testimony was "preposterous," he had been dishonest throughout the proceedings, and he had shown no genuine remorse.  The court also considered the circumstances of the offenses, including that the conduct occurred over a period of months, involved the Defendant's stepdaughter,

and reflected a serious breach of private trust. Finally, the court placed significant weight on deterrence and the public interest, emphasizing the lasting impact of this conduct in a small community.

Based on these findings, the trial court denied judicial diversion and alternative sentencing. It imposed concurrent sentences of eleven months and twenty-nine days, fixed a release eligibility percentage of seventy percent, and ordered the Defendant to register as a sexual offender.

## 2. Standard of Appellate Review

For every issue on appeal, we must first identify the appropriate standard of appellate review. *Enix*, 653 S.W.3d at 698. The Defendant's sentencing claims require us to review distinct sentencing-related determinations: the denial of judicial diversion, the denial of an alternative sentence, and the requirement that he register as a sexual offender.

We review a trial court's sentencing determinations for an abuse of discretion, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Under this standard, we will uphold a sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. This standard also applies to "questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

The same deferential standard applies to a trial court's decision to grant or deny judicial diversion. *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014). As our supreme court has explained,

> Under the *Bise* standard of review, when the trial court considers the *Parker* and *Electroplating* factors, specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion, the appellate court must apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision.

*Id.* at 327.

This presumption does not apply when the trial court fails to identify and weigh the relevant diversion factors. In that circumstance, the appellate court may conduct a de novo review or remand for further findings. *See State v. Sheets*, No. M2022-00538-CCA-R3-CD, 2023 WL 2908652, at *5 (Tenn. Crim. App. Apr. 12, 2023), *no perm. app. filed*. However, this case does not present that circumstance. The trial court separately addressed the considerations relevant to judicial diversion, including the Defendant's amenability to correction, the circumstances of the offenses, his lack of criminal history, his social and family circumstances, deterrence, and the public interest. Because the court identified the relevant considerations and placed its reasoning on the record, we review the denial of judicial diversion with a presumption of reasonableness.

The Defendant asserts that this court should review the trial court's ruling de novo because, in his view, the trial court considered irrelevant factors. We respectfully disagree. As this court recently explained, "[m]erely considering an irrelevant factor will not warrant a finding of abuse of discretion; it is the undue consideration of an irrelevant factor that is prohibited." *State v. Willoughby*, No. E2023-01499-CCA-R3-CD, 2025 WL 1202079, at *4 (Tenn. Crim. App. Apr. 25, 2025), *no perm. app. filed*. As we discuss below, the trial court's denial of judicial diversion rested on recognized diversion considerations. Accordingly, we review the trial court's decision for an abuse of discretion.

### 3.     Denial of Judicial Diversion

Judicial diversion is a form of "legislative largess" available to a qualified defendant. *State v. Schindler*, 986 S.W.2d 209, 211 (Tenn. 1999). In this case, the parties do not dispute that the Defendant was statutorily eligible to be considered for judicial diversion. However, eligibility alone does not entitle a defendant to diversion. *King*, 432 S.W.3d at 323. Rather, eligibility "simply allows the trial court to grant diversion in appropriate cases." *Sheets*, 2023 WL 2908652, at *7 (citation and internal quotation marks omitted).

The judicial diversion statute does not specify the criteria that trial courts should consider when determining whether a qualified defendant is a favorable candidate for judicial diversion. However, in two cases, *State v. Parker*, 932 S.W.2d 945 (Tenn. Crim. App. 1996) and *State v. Electroplating, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998), this court identified seven common-law factors that a trial court must weigh and consider in this analysis:

The criteria that the trial court must consider in deciding whether a qualified accused should be granted judicial diversion include[]: (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as others. The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused.

*Parker*, 932 S.W.2d at 958 (footnote omitted); *Electroplating*, 990 S.W.2d at 229. Our supreme court has affirmed the use of these common-law factors, *see State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017); *State v. Dycus*, 456 S.W.3d 918, 929 (Tenn. 2015), and it has required that "the trial court must weigh the factors against each other and place an explanation of its ruling on the record," *King*, 432 S.W.3d at 326.

The record shows that the trial court complied with these requirements. The court recognized the factors favoring the Defendant, including his lack of prior criminal history and his role in caring for his elderly mother. However, the court found that other considerations weighed more heavily against diversion.

First, the court found that the Defendant was not amenable to correction. In making this finding, the court relied on the Defendant's lack of candor, his continued denial of wrongdoing, and his lack of genuine remorse. These considerations are relevant to whether a defendant is amenable to correction. *See Willoughby*, 2025 WL 1202079, at *5-6. To be sure, a defendant is not required to admit legal guilt as a condition of receiving judicial diversion. But Tennessee law recognizes "a critical distinction between confessing guilt to a crime and accepting responsibility for wrongful conduct." *Stanton v. State*, 395 S.W.3d 676, 688-89 (Tenn. 2013). The trial court's findings addressed the latter concern. The court did not deny diversion because the Defendant exercised his right to trial. Instead, it found that his testimony was not credible, that he had not been honest throughout the proceedings, and that he had not accepted responsibility for his conduct.

Second, the trial court considered the circumstances of the offenses. The court emphasized that the conduct occurred over a period of months, involved the Defendant's stepdaughter, and reflected a serious breach of private trust. The court also found that the Defendant abused a position of private trust, which it considered as an enhancement factor. These circumstances were proper considerations in determining whether judicial diversion would serve the interests of the Defendant and the public.

Third, the court placed substantial weight on deterrence and the interests of the public. These considerations are part of the *Parker* and *Electroplating* analysis. The trial court reasonably concluded that diversion was not appropriate where the Defendant abused a position of private trust, denied responsibility, and caused significant harm to the victim and her family.

Although the Defendant emphasizes factors that favored diversion, including his lack of criminal history, his positive social history, and his caregiving responsibilities, the trial court was not required to give those factors controlling weight. The court recognized the mitigating force of the Defendant's care for his elderly mother. However, it found that other considerations weighed more heavily against diversion, including the Defendant's lack of amenability to correction, the circumstances of the offenses, the abuse of private trust, deterrence, and the interests of the public.

Ultimately, the standard of review is important to our analysis. When reviewing a trial court's decision for an abuse of discretion, we must have "awareness that the decision being reviewed involved a choice among several acceptable alternatives." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). To that end, we may not "second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that [we] would not have chosen." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019). We also may not substitute our judgment for that of the trial court simply because a party believes that another choice would have been a better decision. *Cf. State v. Willis*, 496 S.W.3d 653, 729 (Tenn. 2016).

Instead, the trial court identified the correct legal standards applicable to judicial diversion. It considered and weighed the relevant factors in light of the facts and made a reasoned choice among acceptable alternatives. Its decision was neither illogical nor unreasonable. We conclude that the trial court acted within its discretion to deny the Defendant's request for judicial diversion.

### 4.      Alternative Sentencing

The Defendant next argues that the trial court abused its discretion by denying an alternative sentence and ordering him to serve his misdemeanor sentences in confinement. He emphasizes that he had no prior criminal history, maintained a favorable social history, was in good physical and mental health, and served as a caregiver for his elderly mother. He also asserts that the trial court imposed confinement based solely on the seriousness of the offenses, and that the circumstances of the offenses were not so excessive or

exaggerated as to justify confinement. The State responds that the trial court acted within its discretion in ordering confinement. We agree with the State.

Trial courts have "great flexibility in fashioning a misdemeanor sentence." *State v. Webb*, 130 S.W.3d 799, 834 (Tenn. Crim. App. 2003). When imposing a misdemeanor sentence, the trial court shall impose "a specific number of months, days or hours" to be served, and it shall also "fix a percentage of the sentence that the defendant shall serve" before becoming eligible for certain rehabilitative programs. Tenn. Code Ann. § 40-35-302(b), (d) (2025). Unlike felony sentencing, no presumptive minimum sentence applies to a misdemeanor conviction. *State v. Cooper*, 336 S.W.3d 522, 524 (Tenn. 2011). Moreover, defendants convicted of misdemeanors are not presumed to be favorable candidates for alternative sentencing. *State v. Troutman*, 979 S.W.2d 271, 273 (Tenn. 1998); *Ruiz*, 716 S.W.3d at 458. Instead, the defendant bears the burden of establishing suitability for probation by showing that probation will serve the ends of justice and the best interests of both the public and the defendant. *Ruiz*, 716 S.W.3d at 458.

A misdemeanor sentence must be based on the nature of the offense and the totality of the circumstances in which it was committed, including the defendant's background. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). Sentences involving confinement may be ordered if they are based on one or more of the following considerations:

- whether "[c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct";

- whether "[c]onfinement is necessary to avoid depreciating the seriousness of the offense[,] or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses"; or

- whether "[m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]"

*See* Tenn. Code Ann. § 40-35-103(1)(A)-(C) (2025).

In addition, when considering probation, the court may consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's social history, the defendant's physical and mental condition, the deterrent effect on the

- 41 -

defendant, and the best interests of the defendant and the public. *Ruiz*, 716 S.W.3d at 458. The court also must consider the defendant's potential for rehabilitation. Tenn. Code Ann. § 40-35-103(5); *Ruiz*, 716 S.W.3d at 458.

The record shows that the trial court considered the relevant sentencing principles and made a reasoned decision to deny full probation. The court recognized factors that favored the Defendant. It found that the Defendant had no prior criminal history and gave mitigating weight to his role in caring for his elderly mother. However, the court also found that other considerations weighed against a sentence involving release into the community.

In particular, the court found that the Defendant had poor potential for rehabilitation. It found that the Defendant's trial testimony was "preposterous," that he had been dishonest throughout the proceedings, and that he had not shown genuine remorse. A trial court may consider a defendant's lack of candor, lack of remorse, and failure to accept responsibility when assessing rehabilitative potential and suitability for probation. *See State v. Zeolia*, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996); *State v. Dowdy*, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994); *State v. Sanders*, No. M2023-01148-CCA-R3-CD, 2024 WL 1739660, at *3-4 (Tenn. Crim. App. Apr. 23, 2024), *perm. app. denied* (Tenn. July 17, 2024).

The trial court also considered the circumstances of the offenses. It emphasized that the conduct occurred over a period of months, involved the Defendant's stepdaughter, and constituted a serious breach of private trust. The court further found that the Defendant abused a position of private trust, which it considered as an enhancement factor. These considerations were relevant to the court's assessment of the nature of the offenses, the Defendant's rehabilitative potential, and the interests of the public.

Finally, the court placed substantial weight on deterrence and the public interest. The court reasoned that the offenses had caused lasting harm within the family and the community and that a sentence of confinement was appropriate to reflect the seriousness of the conduct and to deter similar offenses. Although the Defendant argues that the court relied solely on the seriousness of the offenses, the record shows otherwise. The court considered several factors, including the Defendant's lack of candor and remorse, his poor amenability to correction, his abuse of private trust, the circumstances of the offenses, the need for specific and general deterrence, and the interests of the public.

From our review, the trial court correctly identified the applicable law governing its consideration of alternative sentencing. It imposed within-range sentences for the Defendant's Class A misdemeanor convictions, considered the purposes and principles of

sentencing, addressed the relevant statutory and common-law considerations, and explained why it found full probation inappropriate. To the extent the Defendant asks this court to give greater weight to his lack of criminal history, positive social history, and caregiving responsibilities, he asks us to reweigh the sentencing considerations. We may not substitute our judgment for the trial court's reasoned choice among acceptable alternatives. *McCaleb*, 582 S.W.3d at 186. We therefore conclude that the trial court acted within its discretion in denying an alternative sentence. *See Caudle*, 388 S.W.3d at 279. The Defendant is not entitled to relief on this ground.

### 5. Sexual Offender Registration

Finally, the Defendant argues that the trial court erred by requiring him to register as a sexual offender. He does not dispute that the trial court possessed statutory authority to impose this requirement. Instead, he argues that the court's ruling reflected judicial vindictiveness because the court noted that his conviction was "not a plea bargain" and followed a "three-day affair" in which videos were shown. We respectfully disagree and conclude that the trial court acted within its discretion.

Tennessee Code Annotated section 39-13-605(f) gives the trial court discretion to require sexual offender registration when a defendant is convicted of misdemeanor unlawful photography. Before imposing that requirement, the court must consider "the facts and circumstances surrounding the offense, including the offense for which the person was originally charged and whether the conviction was the result of a plea bargain agreement." Tenn. Code Ann. § 39-13-605(f) (2025). We review the trial court's discretionary decision for an abuse of discretion, accompanied by a presumption of reasonableness. *State v. Walsh*, No. M2020-00057-CCA-R3-CD, 2021 WL 1847210, at *8 (Tenn. Crim. App. May 10, 2021), *no perm. app. filed*.

Due process principles prohibit a trial court from punishing a defendant for exercising the right to trial. *See State v. Connors*, 995 S.W.2d 146, 149 (Tenn. Crim. App. 1998). However, the record does not show that the trial court imposed sexual offender registration for that reason. The court's reference to the absence of a plea bargain tracked one of the considerations expressly identified in the statute. Tenn. Code Ann. § 39-13-605(f). That statutory reference, standing alone, does not show that the court treated the Defendant's decision to proceed to trial as an aggravating circumstance, particularly because the court also acknowledged that the Defendant "certainly had a right to have that trial." Viewed in context, the court's reference to a "three-day affair" reflected that the court had heard the evidence at trial and was considering the facts and circumstances

established by that proof. It does not show that the court punished the Defendant for requiring the State to prove its case.

The trial court was not required to repeat each of its sentencing findings when it ordered registration. *See Walsh*, 2021 WL 1847210, at *9; *State v. Rankins*, No. M2019-00687-CCA-R3-CD, 2020 WL 5204229, at *8 (Tenn. Crim. App. Sept. 1, 2020), *no perm. app. filed*. The court had already discussed the circumstances of the offenses, including the prolonged nature of the conduct, the invasion of privacy, and the breach of trust inherent in the Defendant's relationship with the victim. The court then expressly tied registration to the protection of society, concluding that the Defendant should be placed on the registry as a non-violent sexual offender. These considerations fall within the statutory framework and are supported by the record.

In sum, the trial court considered the relevant statutory factors and tied the registration requirement to the circumstances of the offenses and the protection of society. The record does not support the Defendant's claim of judicial vindictiveness. We therefore conclude that the trial court did not abuse its discretion in requiring the Defendant to register as a sexual offender. The Defendant is not entitled to relief on this ground.

## CONCLUSION

In summary, we hold that the trial court committed no reversible error. The Defendant's prosecution was not void from the outset, and the trial court properly denied his motion to suppress statements he made during the criminal investigation under *Garrity v. New Jersey*. The Defendant is also not entitled to relief on his challenge to the admission of digital evidence extracted from his cell phone or on his related due process claim under *Brady* concerning an alleged second forensic report. He likewise has not established reversible error arising from the State's closing argument. Finally, the trial court acted within its discretion in denying judicial diversion and alternative sentencing and in requiring the Defendant to register as a sexual offender. Accordingly, we respectfully affirm the judgments of the trial court.

s/ *Tom Greenholtz*
TOM GREENHOLTZ, JUDGE